IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRUCE EDWARD FERRIEL                                                PLAINTIFF

v.                          Civil No. 06-5061

SHERIFF KEITH FERGUSON;
LT. PAUL CARTER; CAPTAIN
HUNTER PETRAY; DR. NEIL
MULLINS; NURSE SUE McDONALD;
and CORPORAL POWELL                                                 DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds pro

se and in forma pauperis.

Plaintiff is currently incarcerated in the Arkansas Department of Correction.  The events

at issue in this lawsuit occurred while the plaintiff was incarcerated at the Benton County

Detention Center. Specifically, plaintiff contends he was denied adequate medical care and

excessive force was used against him.

Defendants filed a summary judgment motion (Doc. 24).  To assist plaintiff in responding

to the motion, a questionnaire was propounded (Doc. 28).    Plaintiff filed a timely response to

the questionnaire (Doc. 29).  The summary judgment motion is before the undersigned for

issuance of this report and recommendation.

-1-

### Background

On October 26, 2005, Ferriel's suspended sentence was revoked on original charges of possession of a controlled substance, possession of drug paraphernalia, and resisting arrest. *Plaintiff's Response* (Doc. 29)(*hereinafter Resp.*) at ¶ 1. On November 8th, a bench warrant was issued for his arrest. *Id.* at ¶ 2.

Ferriel was arrested and booked into the Benton County Detention Center (BCDC) on December 24th. *Resp.* at ¶ 4. He remained incarcerated there until he was transferred to the Arkansas Department of Correction (ADC) on May 31, 2006. *Id.* at ¶ 64.

When he was booked in, he signed a copy of the detainee rules. *Resp.* at ¶ 4. A medical intake questionnaire was completed indicating Ferriel had no health problems. *Defendants' Exhibit* (*hereinafter Defts' Ex.*) 2 at page 1. Ferriel indicates he was drunk when booked in and he was not asked medical questions. *Resp.* at ¶ 5. However, he states he has been in the BCDC numerous times and they knew his medical history including his past knee surgeries and seizure disorder. *Id.* He does indicate he signed the questionnaire. *Id.*

According to the facts constituting probable cause for arrest, when Ferriel was arrested on December 24th, he was combative with officers and after being placed in a patrol car continued to cry and bang his head against the window. *Defts' Ex.* 1 at pages 9-10. On December 25th, shortly after midnight, Deputy Joshua Culotta heard shouting coming from cell #2 in booking. *Defts' Ex.* 3 at page 1. Culotta looked up and observed Deputy Ron Powell struggling with Ferriel. *Id.*

-2-

Culotta went to cell #2 and Powell had already placed Ferriel on the floor and had his hand behind his back. *Defts' Ex.* 3 at page 1. Culotta placed his handcuff on Ferriel's left wrist and Powell placed the handcuff on Ferriel's right wrist. *Id.*

Ferriel was escorted into booking cell #3 so that he would not attempt to hurt any of the other inmates in detox. *Defts' Ex.* 3 at page 1. Powell attempted to close the door of cell #3 and Ferriel put his foot in the door to prevent the door from closing. *Id.*

According to Culotta's report, the following then occurred:

After removing Mr. Ferriel's foot from the door, Deputy Powell closed the door. I walked away from the cell door and Mr. Ferriel began kicking the door repeatedly. Sergeant Andrew Adams instructed me to five point restrain Mr. Ferriel to prevent him from injuring himself.

I was handed a pair of shackles and another pair of handcuffs. Deputy Powell and I went to the cell door. I instructed Mr. Ferriel to back away from the cell door and sit on the cell bench. Mr. Ferriel backed into the wall near the door and shouted, "F— y—!" I told Mr. Ferriel that if he did not sit on the bench that I would spray him with Oleoresin Capsicum spray. The cell door opened and Mr. Ferriel continued to stand in the doorway. I pulled my OC spray from the belt holder and told Mr. Ferriel that he would sit down immediately or I would spray him.

Mr. Ferriel began breathing heavily and appeared to be having an adrenaline rush. Mr. Ferriel refused to sit down and continued to yell at Deputy Powell and myself. I administered a one second burst of Oleoresin Capsicum spray to Mr. Ferriel's face. Mr. Ferriel continued to stand in the doorway. Deputy Powell and I entered the cell and instructed Mr. Ferriel to go to the floor. Mr. Ferriel stood there and did not move. Deputy Powell and I grabbed Mr. Ferriel and placed him on the floor. Mr. Ferriel tensed his legs and would not allow me to gain control of them. I gained control of Mr. Ferriel's legs and locked them across the ankles so that he could not kick out of the hold and injure himself or Deputy Powell.

Once Mr. Ferriel was under control, Deputy Powell removed the handcuffs, stood Mr. Ferriel on his feet and allowed him to decontaminate his face. After decontaminating Mr. Ferriel's face, handcuffs were replaced in front of Mr. Ferriel. I placed shackles on Mr. Ferriel's feet and made sure they were double locked. I placed another pair of handcuffs on both chains of Mr. Ferriel's

-3-

restraints so that he could not stand up and kick the door.  After double locking all the handcuffs we existed the cell.  Approximately five minutes later I heard a banging noise coming from Mr. Ferriel's cell door.  I informed Sergeant Adams that Mr. Ferriel was kicking the door again.  Deputy Powell asked me to open the cell door.  I opened the cell door and observed Mr. Ferriel's head push the door open indicating that Mr. Ferriel was hitting the door very hard with his head making the banging noise.

Corporal Powell instructed a trustee to get an anti-suicide smock due to Mr. Ferriel's display of suicidal behavior.  Mr. Ferriel's handcuffs and shackles were removed and Deputies Powell, Hoffer, and I escorted Mr. Ferriel into the booking restroom to be dressed out.  When Mr. Ferriel was instructed to remove his clothing he became passively resistant and sat on the floor refusing to move. Sergeant Adams arrived and Mr. Ferriel began talking to the Sergeant.  Mr. Ferriel said that he was having a seizure and needed to see the medical staff.  It should be noted that while Mr. Ferriel was claiming to have a seizure, he was still screaming profanities at us and resisting our commands.

Sergeant Adams asked us if Mr. Ferriel was hitting his head on the door.  We informed him that Mr. Ferriel was hitting his head on the cell door.  Sergeant Adams instructed us to continue dressing Mr. Ferriel into the anti-suicide smock. Mr. Ferriel began shouting, "F— y– all, I had surgery on my knee 9 times!  F— y– all! I'll call Dough Norwood on you're a–!" I instructed Mr. Ferriel to remove his shirt.  He continued to passively resist.  I told Mr. Ferriel that if he did not remove his clothing that we would remove it for him.  Mr. Ferriel continued to shout obscenities and refused to remove his shirt.  Deputy Powell and I removed Mr. Ferriel's shirt.  Deputy Powell and Deputy Hoffer  removed Mr. Ferriel's pants while I maintained control of Mr. Ferriel's left arm.  Deputy Powell removed Mr. Ferriel's socks.

Deputy Hoffer placed the anti-suicide smock over Mr. Ferriel's head.  Deputy Powell and I removed Mr. Ferriel's arms from inside the anti-suicide smock and placed them through the arm holes in the smock.  Deputy Powell and I escorted Mr. Ferriel back into cell #3.  Mr. Ferriel was instructed to get on the floor so that we could replace the restraints.  Mr. Ferriel was handcuffed in the front.  Deputy Powell was locking the shackles on Mr. Ferriel when Mr. Ferriel lifted the smock and grabbed his genitalia.  He began shaking his genitalia with his hands and shouting towards me, "I f----- your mom! Had her a– last week! I got cancer b---- and I'm going to f— you're a— in prison!"  I replaced the handcuffs on the restraint chains and made sure that all restraints were double locked.  I instructed Mr. Ferriel to remain on the floor until we exited the cell.  Mr. Ferriel began to move and continued to shout, "I f----- your mama, I f----- her good last week! I'll

-4-

AO72A
(Rev. 8/82)

get you you fat f-----!" The door closed before Mr. Ferriel was able to get up. I returned to booking and continued my duties with no further incident.

*Defts' Ex.* 3 at pages 1-2 (obscenities omitted).

According to Ferriel, Powell twisted his right "leg very rough because I cried out in pain when I heard a loud popping sound. And felt a sharp pain." *Resp.* at ¶ 12. Ferriel denies he kicked the cell door because he asserts he was in a "hog tie position" and there was no way he could kick. *Id.* at ¶ 13. While he was in this position, Ferriel maintains he was kicked several times by the officers. *Id.* at ¶ 15.

Specifically, Ferriel contends Powell kicked him in the back "many times," punched him three times in the side, once in the face, once in the head, and slammed him into the floor. *Resp.* at ¶ 71. He then contends Powell twisted his right knee backwards and up "beyond my limits." *Id.* As a result, Ferriel indicates he sustained a black eye, a "busted nose and chin," and injuries to his back and knee. *Id.*

Ferriel indicates he was in cuffs and "hog tied" when Culotta sprayed him. *Resp.* at ¶ 18 & ¶ 19. Ferriel indicates Culotta used the spray because Ferriel would not shut up. *Id.* at ¶ 18. Ferriel maintains he was not allowed to wash up for twenty minutes. *Id.* at ¶ 19.

Following the application of mace, Ferriel indicates he had a seizure. *Resp.* at ¶ 21. Ferriel indicates this is what caused his heavy breathing. *Id.* Ferriel states he took Dilantin for his seizures. *Id.* He indicates the Dilantin had been given to him by the defendants many times and had been prescribed by the BCDC's doctor in the past. *Id.*

-5-

When Culotta came to check on him, Ferriel states it was because the other inmates had been yelling for them to come check on him because of his seizure. *Resp.* at ¶ 29. Ferriel indicates he was just coming around from his seizure. *Id.*

Ferriel asserts defendants only maintain he was trying to hurt himself because they are trying to cover up the fact that he had a seizure. *Resp.* at ¶ 31. Ferriel agrees he became passively resistant when asked to remove his clothing. *Id.* at ¶ 33. He asserts he did not have full control of his body yet because he was still coming around from his seizure. *Id.* at ¶ 39. Ferriel states he told the officers they would have to remove his shirt because he couldn't move his arm normally and needed help. *Id.* at ¶ 41.

On December 27th, Ferriel submitted a request stating that he needed to find out how his mother-in-law was doing. *Resp.* at ¶ 49. He noted she had been taken to the hospital and had stopped breathing that day. *Id.* In response, he was told to contact his family for that information. *Id.*

On January 1, 2006, Ferriel asked for a copy of the affidavit of probable cause for his arrest. *Resp.* at ¶ 50. A copy was provided to him by Sgt. Wiens. *Id.*

On January 30th, Deputy G. Baker was performing cell inspections and saw Ferriel's wrist band lying under his mat on his bunk. *Resp.* at ¶ 50. Baker called Ferriel to his cell and asked why he did not have the band on. *Id.* He said it didn't fit properly and would fall off in the shower. *Id.* He also stated he had been told by a deputy on day shift that he would be given a new one but never got one. *Id.*

Baker told Ferriel that he should try to wear it or at least keep it in his pocket and he replied he didn't feel like messing with it in the shower. *Resp.* at ¶ 53. Ferriel was given a

-6-

disciplinary for altering his ID or tampering with his ID and given thirty days lock down and loss of privileges. *Id.* at ¶ 55. He appealed and Lt. Carter modified the lock-down decision after hearing Ferriel's side of the story. *Id.* at ¶ 56.

On March 2nd, Ferriel was sentenced to a ten year term of imprisonment in the ADC. *Resp.* at ¶ 63. On March 8th, Ferriel requested the address for the Sherwood Municipal Court. *Resp.* at ¶ 57. The number was not in the phone book and Ferriel was advised to get the information from a friend or family member. *Id.*

On March 24th, Ferriel complained that he was having severe knee pains and spitting blood due to bleeding ulcers. *Resp.* at ¶ 58(A). He stated he needed surgery for his right knee due to torn ligaments. *Id.* He stated he had been sentenced to the ADC and needed treatment right away. *Id.* In response, he was told that the doctor made all medical decisions at the jail and if he was having medical problems to submit a medical request. *Id.* Ferriel indicates he submitted a medical request. *Id.* at  ¶ 58(B).

On March 27th, Ferriel submitted a grievance. *Resp.* at ¶ 59. Ferriel stated he had medical problems including bleeding ulcers, severe knee problems, and back problems. *Id.* He stated he needed knee surgery because of torn ligaments. *Id.* He stated he needed medication. *Id.* He stated he had been sentenced to the ADC. *Id.* In response, he was told that the doctor makes all medical decisions in the jail. *Id.*

Ferriel was seen by the nurse on April 11th. *Resp.* at ¶ 60(A). He indicates he received no treatment from the nurse. *Id.* Instead, he states he was told he had old scars and they were not responsible for old injuries. *Id.* Defendants' records indicate Ferriel was seen by the nurse again on April 26th. *Defts' Ex.* 2 at page 3.

-7-

Ferriel indicates he saw Dr. Mullins in April although he is not positive of the date. *Resp.* at ¶ 61(B) & ¶ 66.  Ferriel was asked to describe how Dr. Mullins exhibited deliberate indifference to his serious medical needs.  Ferriel responded that Dr. Mullins failed to provide him treatment for his knee. *Resp.* at ¶ 66.  Specifically, Ferriel states the doctor told him "it was old injuries and [their] not gonna do anything plus the jail wouldn't pay since I was sentence to" the ADC. *Id.* at ¶ 61(B).  *See also* ¶ 66.  Ferriel indicates Dr. Mullins noted that he was due to go to prison soon and they would take care of him there. *Id.* at ¶ 66.  Ferriel contends Dr. Mullins could see he was in pain and that his "knee was not stable and still isn't stable today." *Id.*  Ferriel indicates there are bent pins and screws in his knee. *Id.*  He also maintains it pops in and out easily. *Id.*

With respect to Nurse McDonald, Ferriel contends she told Dr. Mullins that Ferriel's knee problems were due to an old injury and Ferriel just wanted attention. *Resp.* at ¶ 67.  Ferriel contends McDonald did not order an x-ray or an MRI to show the extent of damage. *Id.*

Ferriel was asked whether Sheriff Ferguson was personally involved in any of the events that are the subject of his lawsuit.  He responded:  "Yes." *Resp.* at ¶ 68.  Ferriel states he wrote Sheriff Ferguson a "letter and it's his duty to follow up and see what the problem was and if his officers abuse their powers to use unnecessary force. . .  They abuse the power and he didn't even follow up to see.  If they were out of line.  It's his job to over see his staff and make sure the follow the rule's.  I feel he as much a part then they were." *Id.*

With respect to Lt. Paul Carter, Ferriel contends he gave Carter both written and tape recorded statements about the alleged use of force incident before he was transferred to the ADC. *Resp.* at ¶ 69.  Ferriel contends Carter did not follow-up or do anything about the problem. *Id.*

-8-

With respect to Captain Hunter Petray, Ferriel contends Carter told him that Petray had told Carter to get the statements on tape and in writing about the alleged use of force incident. *Resp.* at ¶ 70. Ferriel therefore contends Petray had full knowledge regarding the incident and did nothing about it. *Id.*

Ferriel's intake physical at the ADC was done on June 2nd. *Resp.* at ¶ 73. It was noted he had suffered trauma to his right knee due to a fall from a roof in 1998. *Id.* at ¶ 74. He reported having multiple surgeries. *Id.* The following notations were made: "Moderate crepitus + drawer sign noted. No ballotment, edema, or erythema noted. Decreased full flexion. 20 decreased full flexion." *Id.* It was determined he had post-traumatic arthritis of the right knee. *Id.* at ¶ 75.

On June 13th, Ferriel was were seen complaining of knee pain and prescribed over-the-counter Acetaminophen for three days. *Resp.* at ¶ 76. An x-ray of his right knee was taken on June 7th and showed a defect in the proximal tibia related to the prior hardware placement, an old ununified chip fracture of the inferior patella, and some calcifications about the patella and anterior joint space likely dystrophic in origin. *Id.* The diagnostic impression was post surgical residuals and possible small loose bodies in the joint. *Id.*

Records from Baptist Memorial Medical Center indicate that Ferriel had reconstructive surgery on his right knee on August 7, 1998. *Resp.* at ¶ 78. Since he has been at the ADC, Ferriel indicates he has received orthopedic[1] shoes to relieve pressure on his knee and a sports knee brace. *Id.* at ¶ 79. He also maintains it has been recommended that he have reconstructive

---

[1]In responding to discovery requests, Ferriel attached a copy of an informal resolution form he completed at the ADC. On the form, it indicated the information from his consultation with an orthopedic doctor had been received and Ferriel would be receiving "well padded tennis shoes." *Exhibit C to Plaintiff's Responses to Interrogatories.*

surgery on his knee.  *Id.*  However, he indicates the ADC will not pay for the surgery.  *Id.* at ¶

71.  Since he has been the ADC, the only treatment he has received for his stomach or bleeding

ulcers is mild anti-acids for upset stomach, since too much medicine can cause bleeding.  *Id.* at

¶ 80.

### **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences

in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary

judgment has made a sufficient showing, the burden rests with the non-moving party to set forth

specific facts, by affidavit or other evidence, showing that a genuine issue of material fact

exists."  *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient

evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing

Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"A case founded on speculation or suspicion is insufficient to survive a motion for summary

judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### **Discussion**

Defendants have now moved for summary judgment.  First, defendants contend they are

entitled to judgment as a matter of law because Ferriel failed to exhaust his administrative

remedies with respect to either of his claims.  Second, defendants contend Powell's use of force against Ferriel was objectively reasonable and not excessive.  Third, defendants contend that they were not deliberately indifferent to Ferriel's medical needs.  Finally, with respect to the supervisory defendants, they contend they cannot be held vicariously liable under § 1983.  We will address each argument in turn.

### *Failure to Exhaust Administrative Remedies*

As amended by the Prison Litigation Reform Act (PLRA),  42 U.S.C.  § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001).  Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002).  Specifically, it has been held that a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a). *Conception*, 306 F.3d at 1352.  When all claims have not been exhausted, the case is subject to dismissal. *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

-11-

Defendants contends Ferriel failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a). They contend Ferriel admitted he did not submit any grievances regarding his medical care claim in the complaint at page two.

With respect to the use of force, defendants contend Ferriel submitted two grievances during his incarceration at the BCDC, one dated December 27, 2005, and one dated January 1, 2006, and neither mention any use of force or injury. Due to this failure, defendants maintain plaintiffs' claims should be dismissed based on his failure to exhaust his administrative remedies.       We examine first the alleged admission contained in the complaint. When page two of the complaint is examined, we believe Ferriel has adequately plead an attempt to exhaust his administrative remedies with respect to the denial of medical care claim. *Complaint* (Doc. 1) at page 2. Ferriel is asked if he presented the facts relating to his complaint in the state or county written prisoner grievance procedure. *Id.* He does respond "no." However, if his answer is "no" he is asked to explain. *Id.* Ferriel offers the following explanation: "Because I filed several grievance's relating my medical problems to have them not answer or thrown in trash. Or no response or return at all." *Id.*

Moreover, defendants submitted with their summary judgment materials grievances submitted by Ferriel having to do with his medical care, or lack thereof. The grievances were submitted on March 24, 2006, and March 27, 2006. *Defts' Ex.* 4 at pages 5 & 6. Ferriel did not file this complaint until April 5, 2006. *Complaint* (Doc. 1).

With respect to Powell's alleged use of force, Ferriel contends he submitted a grievance on December 27, 2005, but never got a copy back. *Resp.* at ¶ 72. He alleges detention center officials do not make the inmates copies so they do not have proof to show they filed one. *Id.*

-12-

Ferriel maintains the grievance was removed from his jacket so the defendants could say he never filed one. *Id.*

Ferriel also asserts that before he was transferred to the ADC, sometime in April of 2006, Carter took his written and tape recorded statement about the incident. *Resp.* at ¶ 69. Ferriel did not file a motion to amend his complaint to add Powell as a defendant until August 21, 2006 (Doc. 14). The order granting the motion to amend was entered on September 14, 2006 (Doc. 20).

We believe Ferriel adequately exhausted his administrative remedies with respect to his denial of medical care claim. With respect to the excessive force claim, even if we assume plaintiff did not submit a formal grievance, given the sequence of events alleged to exist by Ferriel, we believe defendants had ample opportunity to attempt to resolve the issue prior to Ferriel filing suit. We therefore decline to dismiss this claim on the grounds that Ferriel failed to exhaust his administrative remedies.

### Denial of Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that

-13-

detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

-14-

In this case, the summary judgment record is simply not well developed enough to conclude Nurse Sue McDonald and Dr. Neil Mullins are entitled to summary judgment. Ferriel's jail medical file consists of his medical questionnaire and two dated sheets of paper containing a list of inmates' names. *Defts' Ex.* 2 at pages 2-3. Ferriel's name is listed under "nurse" on April 11th and April 26th. The court is provided no other information regarding these lists. The court is not given any information with respect to his alleged visits with Nurse McDonald, whether Ferriel was treated or evaluated, whether he was referred to the doctor, seen by the doctor, etc.

Even if we assume Ferriel submitted only the two medical requests dated March 24th and March 27th, he stated on those that he had bleeding ulcers, severe knee problems and back problems. *Defts' Ex.* 4 at pages 5-6. He asserted he needed medical treatment right away. *Id.* In response to both requests, Ferriel was told all medical decisions in the jail were made by the doctor. *Defts' Ex.* 4 at pages 5 & 6.

While there may be valid reasons for discounting Ferriel's assertions, the court is left to guess at what McDonald and/or Dr. Mullins may have believed those reasons to be. The court cannot assume that Ferriel was not in need of medical treatment merely because he previously had knee surgery.

With respect to Sheriff Ferguson, Lt. Paul Carter, Captain Hunter Petray, and Corporal Powell, there is no evidence these defendants were personally involved in making any decisions regarding Ferriel's medical care or treatment. *Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section

-15-

1983 liability requires some personal involvement or responsibility).   These defendants are therefore entitled to summary judgment on this claim.

### Excessive Force

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

At the time of the alleged use of force at issue in this case, defendants assert Ferriel was a pretrial detainee.  In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979).  Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*.  The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.   As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective

-16-

reasonableness standard.").  The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  *See Schoemehl*, 878 F.2d at 1048.  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them.  *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

When he was arrested on December 24th, Ferriel was combative with officers and banging his head against the car window.  *Defts' Ex.* 1 at pages 9-10.  Ferriel indicates he was drunk and cannot remember most of the night.  *Resp.* at ¶ 5.

Ferriel cannot recall his intake papers which were being completed at approximately 11:00 p.m. on December 24th.  *See e.g., Defts' Ex.* 2 at page 1; *Defts' Ex.* 1 at page 3.  A short time later, at 12:15 a.m. on December 15th was when Culotta reported that he saw Powell struggling with Ferriel.  *Defts' Ex.* 3 at page 1.

In responding to the summary judgment motion, Ferriel responds that he is without knowledge to agree or disagree with a great number of questions asked by the court about what is alleged to have occurred between Ferriel, Culotta, and Powell including the following: being placed on the floor in cell #2; being handcuffed by Culotta, and Powell while in cell #2; being escorted to cell #3; and putting his foot in the door to prevent the door from closing.  *Resp.* at ¶¶ 8-¶ 11.

Ferriel does, however, recall Powell attempting to remove his foot from the door to cell #3.  *Resp.* at ¶ 12.  Ferriel contends Powell twisted his right leg.  *Id.* at ¶ 12.

-17-

Ferriel contends Powell kicked him in the back "many times," punched him three times in the side, once in the face, once in the head, and slammed him into the floor. *Resp.* at ¶ 71. Ferriel then contends Powell twisted his right knee backwards and up "beyond my limits." *Id.* As a result, Ferriel indicates he sustained a black eye, a "busted nose and chin," and injuries to his back and knee. *Id.*

However, in response to interrogatories, Ferriel stated Powell "slammed me to the floor and twisted right legg." *Plaintiff's Response to Interrogatory No.* 6. Ferriel also provided the statement of James Lackey with his interrogatory responses. *Plaintiff's Response to Interrogatory No.* 4, Exhibit D. In the statement, Lackey indicates he saw Ferriel on December 26th and observed his "eyes and forehead was red and swollen and puffy." *Id.* Lackey indicates Ferriel was "also limping and not putting much pressure on his right leg." *Id.* Lackey indicates he could smell pepper spray on Ferriel. *Id.* Ferriel reportedly told Lackey he received the injuries when Powell "whipped him." *Id.*

At this point, Ferriel maintains he had a seizure and he indicates he does not know what occurred. *Resp.* at ¶¶ 24-28 & ¶ 30. Ferriel was then taken to be dressed out in a anti-suicide smock. *Id.* at ¶ 32.

Ferriel admits he was drunk and does not recall much of what occurred on the evening in question. Following the incident, he submitted requests on December 27 (concerning his mother-in-law), January 1, 2006 (asking for a copy of his probable cause papers), February 6 (asking for information on his appeal for a disciplinary violation regarding his ID bracelet), March 8 (asking for a court address), March 24 (medical problems), March 26 (medical needs),

-18-

and May 15 (asking for a copy of his plea agreement). *Defts' Ex.* 4. Not a single one of these requests mention any use of force by Powell or any injuries he suffered as a result of the use of force. Not a single one of the requests mentions any seizure or requests medical attention because of a seizure or seizure disorder.

Ferriel supports his claim by what purports to be an affidavit of James Lackey. The "affidavit" is not notarized or sworn to under penalty of perjury. However, even if considered by the court, it merely indicates that Lackey saw Ferriel on December 26th and his eyes and forehead were red, swollen, and puffy. Obviously, this could easily be attributable to the OC spray and/or Ferriel banging his head on the patrol car window when he was arrested. *Defts' Ex.* 3 at page 1; *Defts' Ex.* 1 at pages 9-10. Similarly, Ferriel's limping could be as easily attributable to the five point restraints utilized on him on December 25th, his seizure, or his prior knee injury, as to any use of force by Powell. *Defts' Ex.* 3 at page 1.; *Resp.* at ¶ 23. Lackey's statement does not support Ferriel's assertion that he had a black eye, a busted nose, and a busted chin. *Resp.* at ¶ 17 & ¶ 71.

Given Ferriel's conduct some use of physical force was reasonable under the circumstances. *See e.g., Kenyon v. Edwards*, 462 F.3d 802, 806 (8th Cir. 2006)("Though the encounter apparently resulted in injury to Kenyon's rotator cuff, we believe under the circumstances that Edwards' use of force was reasonable in order to bring a potentially volatile situation under control."); *Lacy v. City of Bolivar,* 416 F.3d 723, 728 (8th Cir. 2006)(Resisting and acting contrary to the instructions of the officer made it necessary to use some force to restrain Lacy. Injuries consisted of only minor cuts and abrasions). Prior to the point when

-19-

Ferriel alleges he suffered a seizure, he was physically struggling with Powell, refused to allow Powell to close the cell door, and refused to be quiet when ordered to do so. *Defts' Ex.* 3 at page 1; *Resp.* at ¶ 18.

Ferriel makes only conclusory allegations regarding the injuries he maintains he received as a result of the use of force by Powell. *See e.g., Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001)("Like any other civil litigant [a pro se litigant is] required to respond to defendants' motion with specific factual support for his claims to avoid summary judgment"). At this stage, Ferriel must support his allegations in some way.

As noted above, there is no mention in any of the requests he submitted of these injuries or the alleged use of force by Powell. While Ferriel maintains he submitted other requests or grievances that are not part of the record, the court finds it difficult to believe that Ferriel did not mention, at least in the March requests for medical treatment, that the injuries to his knee were allegedly the result of the use of force by Powell. Nothing in the medical evidence that has been submitted, the ADC medical records, suggests there is any link between the use of force by Powell and the injuries to Ferriel's knee. *Defts' Ex.* 5 at pages 3-5 & 20; *Resp.* at ¶ 74. In fact, during Ferriel's intake physical he did not mention Powell's use of force or any injury to his knee while he was incarcerated at the BCDC. *Defts' Ex.* 5 at pages 3-5.

With respect to the application of the Oleoresin Capsicum spray, we note that it is undisputed that the spray was applied by Culotta. *Defts' Ex.* 3 at page 1. Culotta is not a named defendant in this case.

-20-

With respect to the remaining defendants, we note they were not involved in the use of force. Sheriff Ferguson, Lt. Paul Carter, and Captain Hunter Petray cannot be held liable merely because they employ an alleged wrongdoer. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)(respondeat superior liability not permissible under § 1983).

Similarly, while Ferriel believes these defendants did not conduct a proper investigation about the incident after the fact. This does not state a claim of constitutional dimension. *See e.g., Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005)(Prisoner has no federally protected liberty interest in having grievances resolved to his satisfaction. "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless.").

Finally, with respect to Sheriff Ferguson there was no evidence suggesting that Powell acted under an official policy, a widespread custom, or practice of Benton County. *Radloff v. City of Oelwein*, 380 F.3d 344, 348 (8th Cir. 2004). *See also Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)("[R]igorous standards of culpability and cause [for a § 1983 claim] must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). Nor is there any evidence Sheriff Ferguson was involved in, or had notice of, or that a lack of supervision or training was likely to result in, the alleged use of force against Ferriel. *Wever v. Lincoln County*, 388 F.3d 601, 606 (8th Cir. 2004)(plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts). Sheriff Ferguson cannot be held liable

-21-

merely because the duties of his position include operating and overseeing the detention facility.

## **Conclusion**

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 24) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to plaintiff's excessive force claim against Corporal Powell.  I further recommend that the motion be granted with respect to all claims asserted against Sheriff Keith Ferguson, Lt. Paul Carter, and Captain Hunter Petray.  Finally, I recommend that the motion be denied with respect to plaintiff's denial of medical care claim asserted against Nurse Sue McDonald and Dr. Neil Mullins.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 24th day of August 2007.


/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)